[No. 2399.]

## CEPHAS WARREN *v.* THE STATE.

1. ASSAULT TO MURDER—AGGRAVATED ASSAULT.—CHARGE OF THE COURT on a trial for assault to murder instructed the jury as follows: "The jury are further instructed, however, if they believe from the evidence that the defendant, Warren, did, at or about the time and place alleged in the indictment, assault the said Brooks with a knife, under circumstances not amounting to an intent to murder as hereinbefore explained, you will, if you so believe from the evidence, find the defendant guilty of an aggravated assault, and assess the punishment therefor." *Held*, erroneous, as an instruction upon the weight of evidence; as a direction to find the defendant guilty at least of the lesser offense named; as against the legal presumption of innocence, and as an invasion of the province of the jury. It was otherwise erroneous because it declares that an assault with a knife is, without any qualification whatever, an aggravated assault, and leaves the jury no discretion but to find the defendant guilty of one or the other of the offenses named in the charge.

2. SAME—SELF DEFENSE.—See the statement of the case for evidence *held* to demand of the trial court a correct charge upon the law of self defense; and note the same for a charge upon self defense *held* insufficient and erroneous.

3. SAME.—See the statement of the case for a special charge which, embody
ing a correct principle of law applicable to the facts in proof, was er-
roneously refused.

APPEAL from the District Court of Smith.   Tried below before
the Hon. F. J. McCord.

The indictment in this case charged the appellant with an as-
sault with intent to murder one Joe Brooks, in Smith county,
Texas, on the twenty-seventh day of April, 1886.   The trial re-
sulted in a conviction for aggravated assault and battery, and
the punishment awarded was a fine of one hundred and fifty
dollars.

Joe Brooks was the first witness for the State.   He testified
that he lived on the defendant's farm in Smith county, Texas,
about nine miles east of the town of Tyler.   Witness rented
land from defendant to work on shares during the year 1886,
agreeing to pay defendant one-third of the corn and one-fourth
of the cotton raised on the land.   Defendant furnished a horse
to the witness, for which the witness was to pay in the fall, or,
failing to pay, was to return it.   Defendant was also to furnish
the witness with supplies, for which witness was to pay out of
the proceeds of his crop when made.   The witness also rented
some land from Mr. Edwards, upon which to plant corn.   De-
fendant came to witness's house on Thursday morning, April —,
1886, and asked witness if he had rented land from Edwards,
and witness told him that he had.   He then asked witness
where he had the bacon obtained from him, defendant, on the
day before.   Witness told him it was in the house.   Defendant
went into the house and made an unsuccessful search for the
bacon.   He failed to find the meat because it had been eaten.
When he came out of the house the defendant remarked that
he was going to have his horse or hurt somebody.   The witness
at that time had a hoe in his hand repairing it for present use.
Defendant went to the stable and got the horse.   Witness
started to the stable to repair the fence in order to keep the
horse from getting out of the lot.   Witness met and passed de-
fendant about midway between the stable and the lot gate.
After passing witness and while witness's back was toward
him defendant sprang upon witness, caught his arm, jerked
him around and cut him.   When defendant sprang at wit-
ness witness's daughter cried: "Pa, he has got a knife."

Witness did not see defendant at that time until after he was cut. Witness's wife came to the lot where the parties were and defendant flourished his knife in her face. The cutting occurred directly in front of the stable from which defendant had just taken the horse. Witness here made profert of a large scar on his right side, which he said was made by the cut from the knife in the hands of the defendant. Witness mounted his horse and rode to Mr. Edwards's house. Edwards met witness at his gate and told him not to go into the house, as his bloody appearance would frighten the women of his family. Edwards and his son Dave took witness to the woodpile and bound up the wound, during which operation witness fainted twice. Mr. Edwards then sent for Doctor Holland and the justice of the peace. Witness soon rode back home. Doctor Holland afterwards came to witness's house and sewed up the wound. Witness went to bed and was laid up two months.

Cross examined, the witness stated that, though he was called Joe Brooks, his proper name was Joe Stephens. Witness rented forty acres of land from the defendant. After renting that land, he proposed to Aaron Jennings to join him in planting the poor portion of it in sorghum. It was afterwards that he rented land from Edwards, and he was working the Edwards land when he was cut. Witness was to return the horse to defendant in case he failed to make a crop on the land. Witness did not object to defendant going into the house to search for the bacon. He did not tell defendant not to take the horse, nor did he otherwise object to the taking of the horse. Witness never claimed the horse as his property. Witness's kitchen was about twenty steps from the house. The lot was about fifty yards from the house, the stable was about six steps from the lot gate. Defendant had taken the horse from the stable when witness went through the gate into the lot, and was leading him. He said nothing to witness in the lot before cutting him. The witness did not take hold of the horse before being cut, nor did he make any effort to seize him. He had no expectation of an assault when it was made. Witness's wife came up after the defendant caught the horse, and said: "Men, don't have any fuss." Alex Williams and Peter Jackson came to witness's house with the defendant, but did not enter the yard. They said nothing while there. When cut, the witness was in the act of stepping into the stable at the door through which the defendant had just led the horse, and was about ready to stoop to pick up a pole with which to

close the door. He was not getting the pole to strike defendant with. Defendant had been visiting witness's house all during witness's tenancy, and witness had no occasion to imagine hard feelings until he was cut. Witness did not tell Dave Edwards that he, witness, was leading the horse out of the stable when defendant cut him. He told Dave Edwards exactly what he has just testified.

Sallie Brooks, the daughter of Joe Brooks, testified, for the State, that Joe Brooks and his family were in their kitchen eating breakfast when the defendant came to the gate, on the morning mentioned in the indictment, and called Joe Brooks. When Joe Brooks joined him in the yard, defendant asked him where that meat was. Joe replied that he supposed it was in the house. Defendant went into and searched the house for the meat, and then went back to the yard and told Joe that he was going to take that horse. Joe told him, in reply, that the law would have to take that horse. Defendant then went through the lot into the stable and put a bridle, which he had brought with him, on the horse and led him out. Joe went into the lot though the gate about the time that defendant came out of the stable. They passed each other about mid way between the lot gate and the stable door, and when Joe had got past defendant, and while his back was towards defendant, the defendant turned, ran upon Joe, seized him by an arm, turned him around and cut him in the side with a knife. Joe had his hands down by his side, and was making no demonstrations when defendant cut him. Joe and defendant quarreled at the house before the latter went to the stable to get the horse.

Cross examined, witness said that she went to the kitchen door when Joe went into the yard in response to defendant's call. Witness followed them when they went to the lot. Joe had nothing but a hoe in his hands at the house. Joe was in front of the stable door and was in the act of turning around when defendant seized and pulled him around and cut him. Defendant had his knife out before he seized Joe. Witness had discussed her knowledge of this affair with no one, further than to tell Joe that she called to him, just before he was cut, that the defendant had a knife, and Joe told her that he did not hear her. When he started towards Joe, the defendant said: "Look'ee here." Defendant did not run upon Joe's wife, and shake his knife in her face, nor did he try to cut her. Joe said that he did not know he was cut until he got back outside of the lot. De-

fendant went out of the gate, and off, after the cutting, leading the horse. Joe hallooed to defendant and told him that he would have him arrested for the cutting. Joe's wife did not go into the stable lot, but staid in the yard. Joe made no effort to strike the defendant with a pole.

Laura Brooks testified, for the State, that Joe Brooks was her father. The witness was in the kitchen at her father's residence, when the defendant, Alex Williams and Peter Jackson came there and called Joe into the yard. Defendant asked Joe where "that meat" was, and afterwards went into the house to search for the meat. He then went back into the yard and told Joe that he was going to have that horse, and went towards the stable. Joe said nothing in reply, but soon followed defendant towards the stable. They met and passed each other between the stable and the lot gate. When Joe had got beyond defendant and had his back turned, defendant sprang upon Joe, seized his arm, turned him around and cut him. Witness was then standing near the yard fence, and did not know that defendant had a knife until he cut Joe.

Cross examined, the witness said that she could not accurately estimate the distance between herself and the lot fence at the time of the cutting. She could not state the distance between herself and her sister Sallie at that time. Witness's mother said to defendant: "Mr. Warren, I don't see what right you have to come here without an officer and create a fuss." Defendant asked her what she had to do with it, and ran up to her and shook his knife in her face, and told her that if she did not dry up he would give her some of it. Witness's mother then stepped back, picked up a stick and told the defendant to "come ahead." Defendant was then inside and Mrs. Brooks outside of the lot, the fence running between them. Joe had no pole or other weapon or thing in his hand, and was making no effort to strike the defendant when the latter cut him. Witness did not have a pole, nor did any one else, save defendant's wife, that witness saw. Witness did not hear her sister Sallie call to Joe that the defendant had a knife.

R. H. C. Butler testified, for the State, that at the time of the alleged offense, he was justice of the peace of precinct number eight, of Smith county, Texas. Some time in April, 1886, defendant came to see the witness about getting out process upon which to seize two of Joe Brooks's horses, upon which he had a lien. Witness told him that he would have to sue out a

writ of sequestration in order to seize the horse upon which he had the lien or mortgage, and a distress warrant in order to seize the horse he had furnished Brooks. He then asked witness what such process would cost him, and, after being told, he asked if he could not get the horse he had furnished Brooks without the process. He remarked that Brooks then owed him more than he would ever be able to pay. Witness told defendant that it was a custom among farmers, when they had furnished their tenants with animals to work the land, and they refused to work the land, to take their animals without process, and that, if defendant could get his horse peacefully, it would be all right, but that if he "raised a row" with Brooks he might lay himself liable to a prosecution for disturbing the peace. He then asked witness if it would not be well to take one or more parties with him, to show, in the event of a prosecution, that he did not disturb the peace. Witness replied that the idea was a good one. On the next day defendant came to witness's house and told witness that he had cut Brooks while Brooks was trying to strike him with a pole. He said that he got the horse he furnished Brooks, and wanted a writ of sequestration for the other horse upon which he had a mortgage. The witness issued the writ of sequestration, and also subpœnas for witnesses to the cutting affray, and gave all the said papers to defendant to be delivered to the constable of precinct number eight, for service. The writ of sequestration was served but the cutting affray was never investigated by the witness, because the defendant was first arrested by the constable of precinct number one. Defendant's general reputation for peace and quietude was good.

Cross examined, witness said that he told defendant that he could take the horse without process if Joe Brooks raised no objection, but that if he created a difficulty he would be liable to prosecution, and that he could not take the horse without process if Brooks objected. The State closed.

Doctor J. H. Holland testified, for the defense, that he went to see Joe Brooks on the second day after he was cut, and he sewed up the wound. He told Brooks to come to his office in eight or ten days and have the stitches taken out. Brooks never came. The wound was not dangerous, but it left a plain scar. A scar will show much more plainly on the skin of a negro than on a white man, and the blacker the negro, the plainer the scar will show. Brooks's arm must have been stretched almost at

full length when he was cut, otherwise the knife would have cut it. The wound was about two inches below the left arm pit. But for the ribs the knife would have penetrated Brook's heart and killed him.

Alex Williams testified, for the defense, that he lived on the place of the defendant's father. On the morning of the difficulty defendant and Peter Jackson came by witness's house, and defendant persuaded witness to go with him to Joe Brooks's house. Arrived there defendant asked Joe Brooks where some meat was. Joe replied: "We have eaten it up, I reckon." Defendant then went into the house, and, while he was in there, Brooks's wife said to Brooks: "Joe, why haven't you killed that nigger? If I was a man I would kill any nigger before I would let him search my house." Joe Brooks replied to her: "Let him alone; I'll get him when he goes to get the horse." Defendant presently came out of the house and told Joe that he had come to get the horse, and asked where the horse was. Joe replied that the horse was in the stable. The defendant then went to the stable and caught the horse, and, as he was going out of the lot with the horse, Joe drew back to strike him with a stick, and defendant cut him. The pole with which Brooks attempted to strike the defendant was four or five feet in length and was one he used to fasten his stable with. When cut, Brooks dropped the pole, and defendant walked out of the lot. He made no effort to cut Brooks a second time. He did not draw his knife on Brooks's wife.

Cross examined, witness said that he knew Mr. Meador by sight. Witness denied that two or three days after the cutting, he told Meador that defendant cut Brooks for nothing; that Joe had nothing in his hand when cut, and that witness did not know before the cutting that the defendant was going to cut Brooks.

Peter Jackson testified, for the defense, substantially as did Alex Williams, except that he said nothing about Mrs. Brooks's remark to her husband while the defendant was in her house, imputed to her by Williams. On his cross examination, the witness said that defendant requested him to go to Brooks's with him to help bring back some things and see that he created no difficulty. If defendant said any thing to Brooks about renting land from Edwards, the witness did not hear him. Witness denied that he ever told Mr. Meador that defendant cut Joe

Brooks for nothing, and that Joe had nothing in his hands when cut.

Henry Lawrence, Doctor Butts and Dave Edwards testified to the good character of the defendant for peace and quietude. Dave Edwards further testified, that he and his father did not carry Joe Brooks from his horse to the wood pile, as stated by Brooks. Brooks walked to the woodpile himself and sat down, when witness and his father dressed the wound. Brooks did not faint a single time during that operation. Brooks told witness that when he was cut he was coming out of the stable leading his horse. Brooks was very bloody when at witness' father's house, just after the cutting. The defense closed.

M. O. Meador testified, for the State, in rebuttal, that he was constable of precinct number one, and as such, a day or two after the cutting, went out to defendant's house to arrest him, and Peter Jackson and Alex Williams, charged jointly with an assault to murder Joe Brooks. A negro named Nelse Hynson, went with witness to point the parties out. Witness found Jackson and Williams in defendant's yard, and asked them to tell him about the cutting. They replied that there was little to tell; that defendant cut Brooks when Brooks had nothing in his hand; that Brooks did nothing when or before he was cut, and that they did not know beforehand that defendant was going to do anything to Brooks.

Cross examined, witness said that he had warrants for the arrest of Jackson and Williams. He did not arrest them nor tell them that he had warrants for them until he went off and found and arrested defendant, when he returned and placed them in arrest. Witness pursued this course and deferred their arrest because he wanted to discover all evidence that was accessible. Williams did most of the talking, though Jackson talked some. The witness supposed they knew he was an officer, as he had his pistol belted around him and they could see it.

The charge of the court upon the question of self defense, referred to in the second head note of this report, reads as follows: "The defendant had a right to defend himself against any deadly assault upon him by the witness Brooks, if such took place under the following circumstances:

"1. It must reasonably appear by the acts, or by words coupled with the acts of the witness Brooks, that it was the purpose and intent of such person to make a deadly assault upon said defendant.

"2. The killing or the infliction of the injury must take place while the witness Brooks was in the act of committing an assault, or after same act done by the said Brooks showing evidently an intent to commit such offense. So that if, at the time the defendant cut and stabbed the witness Brooks, said Brooks was attempting to make a deadly assault upon the defendant, such cutting would be in self defense; or if at the time it reasonably appeared to the mind of the defendant by the acts, or by the words coupled with the acts of said Brooks, that it was his intention to make a deadly assault upon the defendant, and the defendant, to prevent the said assault, cut and stabbed the witness Brooks, such act on the part of defendant would be in his own self defense, and you will acquit.

"But, gentlemen, if the proof shows that the defendant held a mortgage or lien on the horses of the witness Brooks, and he, the defendant, went to the house and lot of the witness Brooks, to take said horses, the witness Brooks had the right to use all means necessary to prevent said defendant from taking said horses, even to the use of force by violence, and, if he was resisting said defendant, by opposing force necessary to prevent the said defendant from taking said horses from the lot, and if the defendant, in order to destroy the resistance offered by the witness Brooks, and to carry said horses off, the defendant drew a knife and cut the witness Brooks, he can not plead such cutting was in his own self defense; and this right of said witness Brooks to resist the said defendant taking the horses home with him, as long as the property was on his premises, and though the defendant may have had the horse by the bridle, leading him through the lot, the witness Brooks might oppose such taking by such necessary force to prevent the taking of said horses, and if the defendant cut and stabbed the defendant (witness Brooks?) while offering such resistance, such cutting would not be in his self defense, though such resistance was in the nature of a threatened assault by Brooks upon the defendant.

"A party has the right to defend the taking of his property even to death, but he must resort to all other means at hand to prevent the taking of property before he can resort to violent means."

The special charge referred to in the third head note of this report reads as follows: "Gentlemen of the jury—You are further charged that, although the defendant went upon the

premises of Joe Brooks, yet if he went upon the said premises without the intent to injure the said Brooks or his property, and with the consent of the said Brooks, then he would not be a trespasser; and if, after he went upon the premises, you believe from the evidence that defendant cut said Brooks, but also believe that Joe Brooks was attacking defendant at the time, or had done some act showing an immediate intent on his part to attack defendant, and that such attack or the acts of defendant (Brooks?), done at the time, produced in defendant a reasonable expectation or fear of death or some serious bodily injury, then defendant would be justified in cutting said Brooks, and it would make no difference whether such danger was real or imaginary, if it had the appearance to defendant of being real, and if he acted on such belief or apparent danger."

The motion for new trial raised the questions discussed in the opinion.

*Hogg & Marsh*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WILLSON, JUDGE. I. After charging the law relating to an assault with intent to murder, the court charged as follows: "The jury are further charged, however, if they believe from the evidence that the defendant Warren did, at or about the time and place alleged in the indictment, assault the said Brooks with a knife under circumstances not amounting to an intent to murder as hereinbefore explained, you will, if you so believe from the evidence, find the defendant guilty of an aggravated assault, and assess the punishment therefor." This charge was promptly excepted to at the time of the trial. We are of the opinion that said charge is erroneous.

As was said by this court in passing upon a similar charge in Harris v. The State, 2 Texas Court of Appeals, 84, "it assumes against the legal presumption of innocence in all criminal cases, that the defendant must be guilty of one or the other offenses named, * * * and it invades the province of the jury, and instructs them to find him guilty, at any rate, of the lesser grade of offense, and was, in that respect, a direct violation of that portion of the statute which prohibits the judge from expressing any opinion as to the weight of evidence." Furthermore, this charge does not correctly state the law. An assault

with a knife is not necessarily an aggravated assault, and yet this charge declares such an assault, without any qualification whatever, to be an aggravated assault, and leaves the jury no discretion but to find the defendant guilty of one or the other of the offenses named in the charge.

II. In charging upon self defense, the court confines the right to protection against a *deadly* assault. What is meant by a *deadly* assault is no where in the charge explained to the jury. Nor do we find this character of assault named in the statute prescribing the rules governing self defense. There was evidence calling for a charge upon self defense, and the law of that issue, as laid down by the statute and the decisions thereon, should have been fully explained to the jury. This duty, in our opinion, was not discharged by the court, and the charge given upon such issue was not the correct law. (Penal Code, Arts. 570, 572, 573, 574; Short v. The State, 15 Texas Ct. App., 370; Cartwright v. The State, 16 Texas Ct. App., 473; Hunnicutt v. The State, 20 Texas Ct. App., 632.) The charge of the court upon self defense was promptly excepted to by defendant at the time of the trial.

III. The third special charge requested by defendant, and refused, was, we think, correct, and was applicable to the facts of the case. It was error to refuse it, and the error was promptly excepted to by the defendant.

Because the court erred in its charge, and in refusing special charge number three requested by defendant, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered November 24, 1886.